UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                           Case No. 3:23-cv-

APPROXIMATELY $57,020 IN
UNITED STATES CURRENCY

      Defendant.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the United States of America brings this complaint and alleges upon information and belief as follows:

### I.    NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States approximately $57,020 in United States Currency (defendant funds).

2.    The defendant funds were seized on April 21, 2022, in Jacksonville, Florida, and are in the government's custody, having been deposited into the United States Marshal Service's Seized Asset Deposit Fund Account.

### II.    JURISDICTION AND VENUE

3.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides

the Court with jurisdiction over actions to recover or enforce forfeitures.

4.     This Court has *in rem* jurisdiction over the defendant funds because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

5.     Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395(a) because the defendant funds were seized within the Middle District of Florida.

6.     Because the defendant funds are in the government's possession, custody, and control, the United States requests that this Court issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(1). Rule G(3)(b)(1) requires the Clerk to issue a warrant of arrest *in rem* for the defendant property if such property is in the government's possession, custody, or control.  After the Court issues the warrant *in rem*, the United States will execute the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

### III.    FORFEITURE AUTHORITY

7.     The defendant funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because they constitute (1) money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substance Act; (2) proceeds traceable to such an exchange; or (3) money used or intended to be used to facilitate any violation of the Controlled Substance Act.

8.    The following facts support a reasonable belief that the government will be able to show by a preponderance of the evidence that the defendant funds are subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6).

## IV.   FACTS

9.    On April 17, 2022, Jeremiah Edward Maryea ("Jeremiah") and Laura Maryea ("Laura"), husband and wife, were ticketed to fly one-way from Jacksonville, Florida to San Francisco, California on an American Airlines flight scheduled to depart Jacksonville at 7:35 AM.

10.    California is a known source state for controlled substances.  It is a common practice for drug traffickers and money couriers to transport currency to California, purchase controlled substances once there, ship the controlled substances back to Florida (often via the U.S. mail or other commercial carriers), and then sell the controlled substances in Florida, or elsewhere.  Drug traffickers often purchase one-way tickets since the drug trade is unpredictable.  The illegal drug trade is a cash business.  Drug traffickers generally do not accept checks, credit cards, debit cards, wire transfers, or any other method of payment that will leave a "paper trail."

11.    In 2016, voters in California approved a ballot measure called Proposition 64. It made marijuana "legal" (at the state level) in California for anyone over the age of 21.  More marijuana is grown in California than is sold within the state, and most of the surplus is shipped east to states where

3

marijuana is still illegal and can be sold at a higher price.

12.     On the morning of April 17, 2022, a Transportation Security Administration ("TSA") employee stopped Jeremiah at an airport security checkpoint after observing what appeared to be a large mass in Jeremiah's carry-on suitcase.

13.     The TSA employee's observation prompted a search of the carry-on suitcase, which revealed several bundles of cash concealed in clothing throughout the suitcase.



14.     The way Jeremiah's cash was packed and concealed was consistent with how drug traffickers and money couriers transport currency.

15.     TSA informed the Drug Enforcement Agency ("DEA") about the incident.  DEA Special Agent Robney Bradshaw and Task Force Officer John Reid responded and learned the following information as relayed by the TSA Supervisor.

## A.   Jeremiah's Interview with TSA

16.   Before the suitcase was searched, when asked by a TSA supervisor whether he had any cash in his suitcase, Jeremiah replied "no."

17.   Upon opening the carry-on suitcase, the TSA Supervisor observed bundles of cash fall out of a pair of shorts packed in the suitcase.  Further search revealed multiple bundles of cash concealed in various items of clothing found in the suitcase.

18.   Thereafter, when asked by the TSA Supervisor about the cash, Jeremiah insisted the suitcase did not belong to him and that the clothing found in it was not his.  Airport surveillance video, however, shows Jeremiah, alongside Laura, bringing the suitcase into the terminal and to the TSA checkpoint.

19.   After denying the suitcase was his, Jeremiah asked the TSA Supervisor, "what if I told you I was a high stakes gambler?"

20.   Laura watched as Jeremiah was interviewed and his luggage was searched. After observing that cash was found in Jeremiah's suitcase, Laura walked toward another concourse without inquiring about what just occurred.

## B.   Jeremiah's Interview with DEA

21.   When interviewed by Special Agent Bradshaw and Task Force Officer Reid, Jeremiah advised in substance, and among other things, that:

a.   Although the suitcase belonged to him, the contents did not;

5

b.      Laura, his wife, packed the suitcase;

c.      The suitcase was in his possession since they left their residence;

d.      He and his wife were headed to San Francisco through Easter (notably, the day of the seizure was Easter);

e.      He and his wife were going to the west coast because they had never been there before;

f.      They did not have a hotel booked in San Francisco but were going to grab one when they got there;

g.      He used to have family in San Francisco but did not any longer;

h.      He laid out his clothes and his wife put the clothes in the carry-on suitcase;

i.      He had never seen the clothing or the money that was in his suitcase;

j.      He did not have a job, but he gets disability;

k.      He receives $1,500 a month in disability but they take out $200 a month for insurance;

l.      He has two kids with Laura and they are staying at his brother's

m.      His brother called DCF (Florida State Department of Children & Families) to report that Jeremiah was on drugs and the kids are living in filthy conditions;

n.      He (Jeremiah) does ½ gram of crack cocaine every other day;

o.      Laura smokes crack cocaine occasionally, but she likes her marijuana;

p.      Laura smokes a joint daily;

6

q.  Laura does not work;

r.  Laura gets approximately $100 a week in child support for her two girls (14 and 8);

s.  He and Laura have two boys (5 and 3);

t.  The last time he traveled was with Laura to Sacramento a couple weeks ago (Note that earlier in the same conversation, Jeremiah said that he and his wife had never traveled to the west coast before);

u.  The last time he traveled out there (the west coast) was on Delta and he came back on United;

v.  He and his wife just traveled out to Sacramento and they did not meet with anyone or really do anything;

w.  They only stayed a couple days;

x.  That this trip was a one-way ticket;

y.  That a friend gave him money for the ticket;

z.  That the friend's name was "JB".

aa.  After the positive alert, the agents asked Jeremiah again whether the contents inside the suitcase were his and he said, "no."

bb.  When asked whether agents could search the suitcase, Jeremiah responded to go ahead because nothing inside the suitcase belonged to him.

cc.  When asked what size pants he wears, he said size 30.

22.  During the entire interview, Jeremiah was yawning excessively, pausing during questioning, and responding to questions with questions.

23.     When asked for JB's phone number, Jeremiah said it was in his other phone and he did not know it.

24.     Jeremiah was asked for and provided consent to search his phone to verify his story, but quickly revoked consent before the phone could be searched.

## C.     Laura's Interview with DEA

25.     When interviewed by Special Agent Bradshaw and Task Force Officer Reid, Laura advised in substance, and among other things, that:

   a.     She and Jeremiah had been married for six years;

   b.     They were separating and were going to California to work things out;

   c.     They went to Sacramento, California about one month ago;

   d.     During that trip, they stayed about three to four days;

   e.     She did not remember where they stayed;

   f.     They have a DCF case against them and the kids are staying at her sister's house;

   g.     They had not picked out a hotel yet (for this trip);

   h.     They live with Jeremiah's grandmother;

   i.     She (Laura) laid out Jeremiah's clothes and he packed the carry-on suitcase by himself;

   j.     She did not touch his bag after it was packed;

   k.     The only money they get is through Cash App, Jeremiah's disability, and her child support;

   l.     She gets $110 in a child support check weekly;

8

m.    "JB" sounds like their landlord (when asked about JB)

n.    She and Jeremiah smoke marijuana and crack cocaine;

o.    She and Jeremiah smoke crack cocaine every day;

p.    Jeremiah purchases all the crack cocaine;

q.    Part of the reason for this trip was to get clean;

r.    She was unemployed;

s.    She and Jeremiah smoke a lot of crack cocaine;

t.    She lived in New Hampshire for approximately one year with Jeremiah's family; and

u.    She and Jeremiah have no reason to go to California now.

26.    In response to the agent's request for a phone number for "JB," Laura provided agents with the cell phone number.

## D.    Phone Calls to Laura's Phone

27.    While speaking with law enforcement, Laura received a phone call.

28.    Special Agent Bradshaw asked Laura to answer the call and place it on speaker. She agreed and proceeded to do so.

29.    An unknown male asked Laura what her status was. Special Agent Bradshaw asked Laura to tell the unknown man that the plane was delayed. She agreed and did so.

30.    The unknown male asked Laura where Jeremiah was.  Special Agent Bradshaw asked Laura to tell the unknown male that Jeremiah was in the restroom. She did so.

31.     Before hanging up, the unknown caller said, "Have f***ing Jeremiah call me when he gets out of the bathroom".

32.     When asked whether the caller was the person known to her as "JB," Laura said she was not sure.

33.     Shortly thereafter, a California phone number called Laura's cell phone. When asked whether she would like to take this call, Laura replied that she would rather not. Laura's phone received a third incoming call, which she said she did not want to answer.

### E.     Positive Alert by Drug Detection Canine

34.     After the interviews, the agents had a properly trained narcotics detection dog conduct a free air sniff of the discovered cash.  The dog is trained to detect the odor of six controlled substances: marijuana, cocaine HCL, cocaine base, heroin, methamphetamine, and MDMA.  The dog positively alerted to the presence of the odor of drugs on the cash.

35.     Individuals who handle controlled substances often get traces of the substance on their hands and clothing.  These trace amounts of controlled substances can easily be spread to other items the individual touches such as currency.  A positive alert to United States currency by a properly trained dog indicates that the currency had either been handled by someone who had trace amounts of controlled substance in their hands, or the currency had recently been near a controlled substance.

36.     Upon the search by DEA, bundles of cash were found in the pant pockets of a pair of jeans and inside the sleeves of a hoodie packed within the suitcase.  Jeremiah told the agents both that he wore a size 30 in pants and that the clothes in the suitcase were not his. Notably, the pants found in the suitcase were a size 42.

37.     Jeremiah told agents that they could go ahead and seize the cash because he had no idea where the money came from.

38.     The total amount of currency that Jeremiah was carrying was $57,020, which was comprised of the following:

      a.     8 - $100 bills

      b.     21 - $50 Bills

      c.     2712 - $20 bills

      d.     83 - $10 Bills

      e.     20 - $5 Bills

39.     The agents seized the $57,020.

40.     Administrative forfeiture proceedings were instituted, and Laura did not contest or otherwise object to the forfeiture of the currency.

41.     In short, (1) the sheer quantity of cash ($57,020), (2) the way the cash was packed and concealed, (3) the fact that Jeremiah and Laura were both flying to a source state for controlled substances, (4) the fact that Jeremiah and Laura both had one-way tickets, (5) Jeremiah's conflicting and changing stories,

(6) Jeremiah's claim that he did not own the contents of the suitcase, (7) the fact that Laura walked away after seeing that Jeremiah was being interviewed by law enforcement and his luggage was searched, (8) the fact that both Jeremiah and Laura are admitted marijuana and crack cocaine users, suggesting drug abuse and/or addition, the need for money, and motivation to participate in drug trafficking, (9) the fact that Laura's phone received three suspicious phone calls, including one that took a directive tone when asking about Laura's status and Jeremiah's whereabouts, (10) the fact that a trained canine detection dog positively alerted to the presence of the odor of drugs on the cash found in Jeremiah's suitcase, and (11) the fact that Laura never filed a claim to the seized funds, all support a finding that the defendant currency ($57,0202) is connected to a controlled substance violation.

## V.   **CONCLUSION**

42.   As required by Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the defendant funds are proceeds traceable to the exchange of controlled substance or were intended to be exchanged for a controlled substance, in violation of 21 U.S.C. § 841 and 846 and, therefore, are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America requests that process in accordance with the provisions of Rule G, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, be issued against the defendant funds to enforce the forfeiture and that any person or persons having an interest therein be cited and directed to appear and show cause why it should not be decreed; and that the defendant funds be forfeited to the United States; and that thereafter it be disposed of according to law; and for such other and further relief as this case may require.

Dated:  February 17th, 2023.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney


By:   _____
MAI TRAN
Assistant United States Attorney
Florida Bar No. 100982
300 N. Hogan Street, Ste 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: mai.tran2@usdoj.gov

13

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Robney R. Bradshaw, declare under the penalty of perjury, that:

I am a Special Agent with the Drug Enforcement Administration. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 17th day of February, 2023.

ROBNEY R. BRADSHAW
Special Agent
Drug Enforcement
Administration

14